JUDGE CASTEL

12 CIV 4099

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MAREN TWINING, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FACEBOOK, INC.; MARK ZUCKERBERG; SHERYL K. SANDBERG; DAVID A. EBERSMAN; MARC L. ANDREESSEN; ERSKINE B. BOWLES; JAMES W. BREYER; DONALD E. GRAHAM; REED HASTINGS; PETER A. THIEL; MORGAN STANLEY & CO. INC.; J.P. MORGAN SECURITIES LLC; GOLDMAN, SACHS & CO.; MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BARCLAYS CAPITAL INC.; ALLEN & COMPANY LLC; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; DEUTSCHE BANK SECURITIES INC.; RBC CAPITAL MARKETS, LLC; WELLS FARGO SECURITIES, LLC; BLAYLOCK ROBERT VAN LLC; BMO CAPITAL MARKETS CORP.; C.L. KING & ASSOCIATES, INC.; CABRERA CAPITAL MARKETS, LLC; CASTLEOAK SECURITIES, L.P.; COWEN AND COMPANY, LLC; E*TRADE SECURITIES LLC; ITAÚ BBA USA SECURITIES, INC.; LAZARD CAPITAL MARKETS LLC; LEBENTHAL & CO., LLC; LOOP CAPITAL MARKETS LLC; M.R. BEAL & COMPANY; MACQUARIE CAPITAL (USA) INC.; MURIEL SIEBERT & CO., INC.; OPPENHEIMER & CO. INC.; PACIFIC CREST SECURITIES LLC; PIPER JAFFRAY & CO.; RAYMOND JAMES & ASSOCIATES, INC.; SAMUEL A. RAMIREZ & COMPANY, INC.; STIFEL, NICOLAUS & COMPANY, INC.; THE WILLIAMS CAPITAL GROUP, L.P.; and WILLIAM BLAIR & COMPANY, L.L.C.,<br>Defendants. | Case No. _____<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

Maren Twining ("Plaintiff"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Facebook, Inc. ("Facebook" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Facebook; and (c) review of other publicly available information concerning Facebook.

## SUMMARY OF THE ACTION

1.      This is a federal class action on behalf of purchasers of Facebook's securities who acquired their securities pursuant or traceable to the Company's Initial Public Offering (the "IPO" or "Offering") on or about May 18, 2012, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      Facebook is a social media platform which allows users to connect with other users and allows developers to build applications ("apps") and websites that integrate with Facebook to reach the Company's global network of users. The Company is incorporated in Delaware and headquartered in Menlo Park, California.

3.      On May 18, 2012, the Company conducted its IPO. The IPO raised over $16 billion by selling over 420 million shares of the Company's common stock to investors at a price of $38.00 per share. In connection with the IPO, certain Defendants filed a Registration Statement with several amendments and a Prospectus (collectively referred to as the "Offering Materials").

4.     Before the IPO, the Underwriter Defendants (defined below) were made privy to information which caused certain of their analysts to reduce revenue forecasts for the Company.

5.     According to news reports, this lower revenue projection was selectively released by the underwriter banks to only certain clients.

6.     In selectively disseminating information to the underwriters, Facebook altered its revenue guidance without informing the investing public of this material information.

7.     By selectively disseminating information to certain of their clients, the Underwriter Defendants acted in direct contravention of SEC Regulation FD and allowed certain investors to act on the insider information.

8.     This insider information contributed to the weak market for the IPO shares.

9.     On Monday, May 21, 2012, shares plummeted to end 10 percent below the IPO price.

10.    In reaction to further revelations of impropriety on Tuesday, May 22, 2012, shares of Facebook's stock fell 8.9 percent, to close at $31.00 per share

11.    The Company and the Individual Defendants (defined herein) made materially misleading statements, and/or failed to disclose information necessary to make various statements not materially misleading. As a result, the Facebook shares were sold at artificially inflated prices on the IPO.

## JURISDICTION AND VENUE

12.    This action arises under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k,77l(a)(2) and 77o).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

14.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District. Additionally, many of the Defendant Underwriters (defined below) maintains their principal executive offices within this District, and at relevant times, Facebook's stock traded on the NASDAQ exchange.

15.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications.

## PARTIES

**Plaintiff**

16.     Maren Twining as set forth in the accompanying certification, purchased Facebook common stock on the IPO from one of the Underwriter Defendants, and suffered damages as a result of the federal securities law violations and false and misleading statements and/or material omissions alleged herein.

**Facebook**

17.     Defendant Facebook is incorporated in Delaware and headquartered in Menlo Park, California.  The Company was incorporated in 2004, and conducted its IPO on May 18, 2012. Facebook common shares trade on the NASDAQ under the ticker symbol "FB."

**Directors/Officers**

18.     Defendant Mark Zuckerberg ("Zuckerberg") is Facebook's founder and has served as the Company's CEO and as a member of the Company's board of directors since July 2004. Zuckerberg has served as Chairman of Facebook's board of directors since January 2012.

Zuckerberg is a controlling stockholder and the Company's largest stockholder.

**Officers**

19.    Defendant Sheryl K. Sandberg ("Sandberg") has served as Facebook's Chief Operating Officer since March 2008. From November 2001 to March 2008, Sandberg served in various positions at Google, Inc., most recently as Vice President, Global Online Sales & Operations. Sandberg also is a former Chief of Staff of the U.S. Treasury Department and previously served as a consultant with McKinsey & Company, a management consulting company, and as an economist with The World Bank. Sandberg has been a member of the board of directors of the Walt Disney Company since December 2009. Sandberg holds an A.B. in economics from Harvard University and an M.B.A. from Harvard Business School.

20.    Defendant David A. Ebersman ("Ebersman") has served as Facebook's Chief Financial Officer since September 2009. Prior to joining Facebook, Ebersman served in various positions at Genentech, Inc., a biotechnology company. Prior to joining Genentech, Ebersman was a research analyst at Oppenheimer & Company, Inc., an investment company. In addition to serving as our Chief Financial Officer, Ebersman has been a member of the board of directors of Ironwood Pharmaceuticals, Inc. since July 2009. Ebersman holds an A.B. in economics and international relations from Brown University.

**Directors**

21.    Defendant Marc L. Andreessen ("Andreessen") has served as a member of Facebook's board of directors since June 2008. Andreessen is a co-founder and has been a General Partner of Andreessen Horowitz, a venture capital firm, since July 2009. Previously, Andreessen co-founded and served as the Chairman of the board of directors of Opsware, Inc. (formerly known as Loudcloud Inc.), a software company. He also served as Chief Technology Officer of America Online, Inc., an Internet services company. Andreessen was a co-founder of

Netscape Communications Corporation, a software company, serving in various positions, including Chief Technology Officer and Executive Vice President of Products. In addition to serving on Facebook's board of directors, Andreessen currently serves as a member of the boards of directors of eBay Inc. and the Hewlett-Packard Company. Andreessen holds a B.S. in computer science from the University of Illinois at Urbana-Champaign.

22.    Defendant Erskine B. Bowles ("Bowles") has served as a member of Facebook's board of directors since September 2011. Bowles is President Emeritus of the University of North Carolina and served as President from January 2006 through December 2010. Bowles has also been a Senior Advisor of BDT Capital Partners, LLC, a private investment firm, since January 2012. From February 2010 until December 2010, he served as Co-Chair of the National Commission on Fiscal Responsibility and Reform. Bowles has been a Senior Advisor since 2001 and was Managing Director from 1999 to 2001 of Carousel Capital LLC, a private investment firm. He was also a partner of Forstmann Little & Co., an investment firm, from 1999 to 2001. Bowles began his career in corporate finance at Morgan Stanley and subsequently helped found and ultimately served as Chairman and Chief Executive Officer of Bowles Hollowell Connor & Co., an investment banking firm. Bowles served as White House Chief of Staff from 1996 to 1998 and Deputy White House Chief of Staff from 1994 to 1995. In addition to serving on Facebook's board of directors, Bowles currently serves as a member of the boards of directors of Morgan Stanley, Belk, Inc., and Norfolk Southern Corporation. Bowles holds a B.S. in business from the University of North Carolina at Chapel Hill and an M.B.A. from Columbia University Graduate School of Business.

23.    Defendant James W. Breyer ("Breyer") has served as a member of Facebook's board of directors since April 2005. Breyer has been a Partner of Accel Partners, a venture

5.

capital firm, since 1987, and currently serves as President of Accel Management Co. Inc. Breyer is also the founder and has been the Chief Executive Officer of Breyer Capital, an investment firm, since July 2006. Breyer is also a co-founder and has been co-lead on the strategic investment committee since inception of the IDG-Accel China Funds. In addition to serving on Facebook's board of directors, Breyer currently serves as a member of the boards of directors of Brightcove Inc., Dell, Inc., News Corporation, Prosper Marketplace, Inc., and Wal-Mart Stores, Inc., where he is the lead/presiding independent director. Breyer previously served as a member of the board of directors of Marvel Entertainment Inc. from June 2006 to December 2009 and RealNetworks, Inc. from October 1995 to June 2008. Breyer holds a B.S. in interdisciplinary studies from Stanford University and an M.B.A. from Harvard University.

24.     Defendant Donald E. Graham ("Graham") has served as a member of Facebook's board of directors since March 2009. Graham has served as the Chief Executive Officer of The Washington Post Company, an education and media company, since 1991 and as Chairman of its board of directors since 1993. Graham holds an A.B. in English history and literature from Harvard University.

25.     Defendant Reed Hastings ("Hastings") has served as a member of Facebook's board of directors since June 2011. Hastings has served as the Chief Executive Officer and Chairman of the board of directors of Netflix, Inc., a provider of an Internet subscription service for movies and television shows, since 1999. Prior to Netflix, Hastings served as Chief Executive Officer of Technology Network, a political service organization for the technology industry. Hastings served as Chief Executive Officer of Pure Atria Software, a maker of software development tools, from 1991 until it was acquired by Rational Software Corporation, a software company, in 1997. In addition to serving on Facebook's board of directors, Hastings currently

6.

serves as a member of the board of directors of Microsoft Corporation. Hastings holds a B.A. in mathematics from Bowdoin College and an M.S.C.S. in computer science from Stanford University.

26.     Defendant Peter A. Thiel ("Thiel") has served as a member of Facebook's board of directors since April 2005. Since 2005, Thiel has been a Partner of Founders Fund, a venture capital firm. Thiel has also served as President of Clarium Capital Management, LLC, a global macro investment manager, since 2002. In 1998, Thiel co-founded PayPal, Inc., an online payment company, where he served as Chief Executive Officer, President and as Chairman of its board of directors from 2000 until its acquisition by eBay in 2002. Prior to that, Thiel worked for Credit Suisse, an investment firm, and Sullivan & Cromwell LLP, a law firm. Thiel holds a B.A. in Philosophy from Stanford University and a J.D. from Stanford Law School.

27.     Defendants Zuckerberg, Sandberg, Ebersman, Andreessen, Bowles, Breyer, Graham, Hastings, and Thiel are collectively referred to herein as the "Individual Defendants." The Individual Defendants, as senior executive officers and/or directors of Facebook, were privy to confidential and proprietary information concerning Facebook, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Facebook, as discussed in detail below. Because of their positions with Facebook, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or

7.

recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's Registration Statement, reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

29.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Facebook's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Facebook's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions alleged herein violated these specific requirements and obligations.

30.     The Individual Defendants are liable as participants in the violations alleged herein in that they: (i) deceived the investing public regarding Facebook's business, operations and management and the intrinsic value of Facebook's common stock; (ii) enabled the Company to complete an IPO of its shares, on May 18, 2012, whereby the Company sold approximately 420 million shares and reaped $16 billion in gross proceeds; and (iii) caused plaintiff and

members of the Class to purchase Facebook common stock at artificially inflated prices.

**Underwriter Defendants**

31.     Defendant Morgan Stanley & Co. Inc. ("Morgan Stanley") was an underwriter of the Company's IPO. Morgan Stanley was allotted 38.5% of the shares to be sold in the IPO and was to receive 38.5% of the approximately $176 million in underwriting fees. Morgan Stanley assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Morgan Stanley was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Morgan Stanley maintains an address for service of process in New York, New York.

32.     Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter of the Company's IPO.  JPMorgan was allotted 20.15% of the shares to be sold in the IPO and was to receive 20.15% of the approximately $176 million in underwriting fees.  JPMorgan assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, JPMorgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  JPMorgan maintains an address for service of process in New York, New York.

33.     Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of the Company's IPO. Goldman Sachs was allotted 15% of the shares to be sold in the IPO and was to receive 15% of the approximately $176 million in underwriting fees. Goldman Sachs assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Goldman Sachs maintains an address for service of process in New York, New York.

34.     Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") was an underwriter of the Company's IPO. Merrill Lynch was allotted 6.5% of the shares to be sold in the IPO and was to receive 6.5% of the approximately $176 million in underwriting fees. Merrill Lynch assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Merrill Lynch maintains an address for service of process in New York, New York.

35.     Barclays Capital Inc. ("Barclays Capital") was an underwriter of the Company's IPO. Barclays Capital was allotted 6.5% of the shares to be sold in the IPO and was to receive 6.5% of the approximately $176 million in underwriting fees. Barclays Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Barclays Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Barclays Capital maintains an address for service of process in New York, New York.

36.     Allen & Company LLC ("Allen & Company") was an underwriter of the Company's IPO. Allen & Company was allotted 2.0% of the shares to be sold in the IPO and was to receive 2.0% of the approximately $176 million in underwriting fees. Allen & Company assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Allen & Company was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Allen & Company maintains an address for service of process in New York, New York.

37.     Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's IPO. Citigroup was allotted 2.25% of the shares to be sold in the IPO and was to

10.

receive 2.25% of the approximately $176 million in underwriting fees. Citigroup assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Citigroup maintains an address for service of process in New York, New York.

38.     Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's IPO. Credit Suisse was allotted 2.25% of the shares to be sold in the IPO and was to receive 2.25% of the approximately $176 million in underwriting fees. Credit Suisse assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Credit Suisse was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Credit Suisse maintains an address for service of process in New York, New York.

39.     Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's IPO. Deutsche Bank was allotted 2.25% of the shares to be sold in the IPO and was to receive 2.25% of the approximately $176 million in underwriting fees. Deutsche Bank assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Deutsche Bank maintains an address for service of process in New York, New York.

40.     RBC Capital Markets, LLC ("RBC Capital Markets") was an underwriter of the Company's IPO. RBC Capital Markets was allotted 1.00% of the shares to be sold in the IPO and was to receive 1.00% of the approximately $176 million in underwriting fees. RBC Capital Markets assisted in the preparation and dissemination of the Offering Materials. As an

11.

underwriter of the Offering, RBC Capital Markets was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. RBC Capital Markets maintains an address for service of process in New York, New York.

41.     Wells Fargo Securities, LLC ("Wells Fargo") was an underwriter of the Company's IPO. Wells Fargo was allotted 1.00% of the shares to be sold in the IPO and was to receive 1.00% of the approximately $176 million in underwriting fees. Wells Fargo assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Wells Fargo was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Wells Fargo maintains an address for service of process in San Francisco, California.

42.     Blaylock Robert Van LLC ("Blaylock Robert Van") was an underwriter of the Company's IPO. Blaylock Robert Van was allotted .16% of the shares to be sold in the IPO and was to receive .16% of the approximately $176 million in underwriting fees. Blaylock Robert Van assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Blaylock Robert Van was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Blaylock Robert Van maintains an address for service of process in New York, New York.

43.     BMO Capital Markets Corp. ("BMO Capital") was an underwriter of the Company's IPO. BMO Capital was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. BMO Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, BMO Capital was responsible for ensuring the truthfulness and accuracy of the various

statements contained in or incorporated by reference into the Offering Materials. BMO Capital maintains an address for service of process in New York, New York.

44.     C.L. King & Associates, Inc. ("C.L. King") was an underwriter of the Company's IPO. C.L. King was allotted .15% of the shares to be sold in the IPO and was to receive .15% of the approximately $176 million in underwriting fees. C.L. King assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, C.L. King was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. C.L. King maintains an address for service of process in Albany, New York.

45.     Cabrera Capital Markets, LLC ("Cabrera Capital") was an underwriter of the Company's IPO. Cabrera Capital was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Cabrera Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Cabrera Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Cabrera Capital maintains an address for service of process in Chicago, Illinois.

46.     CastleOak Securities, L.P. ("CastleOak Securities") was an underwriter of the Company's IPO. CastleOak Securities was allotted .16% of the shares to be sold in the IPO and was to receive .16% of the approximately $176 million in underwriting fees. CastleOak Securities assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, CastleOak Securities was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. CastleOak Securities maintains an address for service of process in New

York, New York.

47.    Cowen and Company, LLC. ("Cowen and Company") was an underwriter of the Company's IPO. Cowen and Company was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Cowen and Company assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Cowen and Company was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  Cowen and Company maintains an address for service of process in New York, New York.

48.    E*TRADE Securities LLC ("E*TRADE Securities") was an underwriter of the Company's IPO. E*TRADE Securities was allotted .05% of the shares to be sold in the IPO and was to receive .05% of the approximately $176 million in underwriting fees. E*TRADE Securities assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, E*TRADE Securities was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials.  E*TRADE Securities maintains an address for service of process in New York, New York.

49.    Itaú BBA USA Securities, Inc. ("Itaú BBA USA Securities") was an underwriter of the Company's IPO. Itaú BBA USA Securities was allotted .05% of the shares to be sold in the IPO and was to receive .05% of the approximately $176 million in underwriting fees. Itaú BBA USA Securities assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Itaú BBA USA Securities was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference

into the Offering Materials. Itaú BBA USA Securities maintains an address for service of process in New York, New York.

50.     Lazard Capital Markets LLC ("Lazard Capital") was an underwriter of the Company's IPO. Lazard Capital was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Lazard Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Lazard Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Lazard Capital maintains an address for service of process in New York, New York.

51.     Lebenthal & Co., LLC ("Lebenthal & Co.") was an underwriter of the Company's IPO. Lebenthal & Co. was allotted .16% of the shares to be sold in the IPO and was to receive .16% of the approximately $176 million in underwriting fees. Lebenthal & Co. assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Lebenthal & Co. was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Lebenthal & Co. maintains an address for service of process in New York, New York.

52.     Loop Capital Markets LLC ("Loop Capital") was an underwriter of the Company's IPO. Loop Capital was allotted .16% of the shares to be sold in the IPO and was to receive .16% of the approximately $176 million in underwriting fees. Loop Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Loop Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Loop Capital maintains an address for service of process in New York, New York.

53. M.R. Beal & Company ("M.R. Beal") was an underwriter of the Company's IPO. M.R. Beal was allotted .16% of the shares to be sold in the IPO and was to receive .16% of the approximately $176 million in underwriting fees. M.R. Beal assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, M.R. Beal was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. M.R. Beal maintains an address for service of process in New York, New York.

54. Macquarie Capital (USA) Inc. ("Macquarie Capital") was an underwriter of the Company's IPO. Macquarie Capital was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Macquarie Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Macquarie Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Macquarie Capital maintains an address for service of process in New York, New York.

55. Muriel Siebert & Co., Inc. ("Muriel Siebert") was an underwriter of the Company's IPO. Muriel Siebert was allotted .16% of the shares to be sold in the IPO and was to receive .16% of the approximately $176 million in underwriting fees. Muriel Siebert assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Muriel Siebert was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Muriel Siebert maintains an address for service of process in New York, New York.

56. Oppenheimer & Co. Inc. ("Oppenheimer & Co.") was an underwriter of the Company's IPO. Oppenheimer & Co. was allotted .10% of the shares to be sold in the IPO and

was to receive .10% of the approximately $176 million in underwriting fees. Oppenheimer & Co. assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Oppenheimer & Co. was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Oppenheimer & Co. maintains an address for service of process in New York, New York.

57.     Pacific Crest Securities LLC ("Pacific Crest") was an underwriter of the Company's IPO. Pacific Crest was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Pacific Crest assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Pacific Crest was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Pacific Crest maintains an address for service of process in Portland, Oregon.

58.     Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of the Company's IPO. Piper Jaffray was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Piper Jaffray assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Piper Jaffray was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Piper Jaffray maintains an address for service of process in New York, New York.

59.     Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's IPO. Raymond James was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Raymond James assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the

17.

Offering, Raymond James was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Raymond James maintains an address for service of process in New York, New York.

60.     Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez & Company") was an underwriter of the Company's IPO. Samuel A. Ramirez & Company was allotted .15% of the shares to be sold in the IPO and was to receive .15% of the approximately $176 million in underwriting fees. Samuel A. Ramirez & Company assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Samuel A. Ramirez & Company was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Samuel A. Ramirez & Company maintains an address for service of process in New York, New York.

61.     Stifel, Nicolaus & Company, Incorporated ("Stifel, Nicolaus & Company") was an underwriter of the Company's IPO. Stifel, Nicolaus & Company was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees. Stifel, Nicolaus & Company assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, Stifel, Nicolaus & Company was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Stifel, Nicolaus & Company maintains an address for service of process in New York, New York.

62.     The Williams Capital Group, L.P. ("Williams Capital") was an underwriter of the Company's IPO. Williams Capital was allotted .14% of the shares to be sold in the IPO and was to receive .14% of the approximately $176 million in underwriting fees. Williams Capital assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the

Offering, Williams Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. Williams Capital maintains an address for service of process in New York, New York.

63.     William Blair & Company, L.L.C. ("William Blair & Company") was an underwriter of the Company's IPO.  William Blair & Company was allotted .10% of the shares to be sold in the IPO and was to receive .10% of the approximately $176 million in underwriting fees.   William Blair & Company assisted in the preparation and dissemination of the Offering Materials. As an underwriter of the Offering, William Blair & Company was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Offering Materials. William Blair & Company maintains an address for service of process in New York, New York.

64.     Defendants in paragraphs 31-63 are referred to herein as the "Underwriter Defendants."   The Underwriter Defendants served as financial advisors, and assisted in the preparation and dissemination of the Offering Materials for Facebook's public stock offering.

### SUBSTANTIVE ALLEGATIONS

#### Background

65.     On or about May 18, 2012, Facebook conducted its IPO. The IPO raised over $16 billion by selling over 420 million shares of the Company's common stock to investors at a price of $38.00 per share. In connection with the IPO, the Defendants prepared, filed and disseminated the Offering Materials.

#### User Metrics

66.     Monthly active users ("MAUs") are used by Facebook as a measure of the size of Facebook's global active user community.  MAUs are defined as a registered Facebook user who

logged in and visited Facebook through the Company's website or a mobile device, or took an action to share content or activity with his or her Facebook friends or connections via a third-party website that is integrated with Facebook, in the last 30 days as of the date of measurement.

67.    Daily Active Users ("DAUs") are used by Facebook as a measure of user engagement. The Company defines a DAU as a registered Facebook user who logged in and visited Facebook through the Company's website or a mobile device, or took an action to share content or activity with his or her Facebook friends or connections via a third-party website that is integrated with Facebook, on a given day.

68.    Facebook also track Mobile MAUs which are defined as a user who accessed Facebook via a mobile app or via mobile-optimized versions of the Company's website such as m.facebook.com, whether on a mobile phone or tablet such as the iPad, during the period of measurement.

69.    Facebook explains the importance of these metrics in its Registration Statement as follows:

> Growth in MAUs, DAUs, and Mobile MAUs. **Growth trends in MAUs, DAUs, and mobile MAUs are critical variables that affect our revenue and financial results by influencing the number of ads we are able to show, the value of those ads, the volume of Payments transactions, as well as our expenses and capital expenditures.** We expect our user growth rates to decline as the size of our active user base increases and as we achieve higher market penetration rates. Additionally, as we grow our business and expand internationally, we expect to face challenges entering new markets such as China, where access to Facebook is restricted in whole or in part. As user growth rates slow, we expect the rate of growth in revenue will likely decline over time, which will affect our income from operations and net income.
>
>                                                          [Emphasis added.]

### Defendants' Improper Use of Material Insider Information

70.    After the filing of the Registration Statement, Defendants participated in a Road

Show which involves giving presentations to analysts, fund managers, or potential investors in various cities in order to fuel interest in the securities being offered and "build the book."

71.     On May 9, 2012 Facebook filed an amended prospectus with the SEC, in which the company expressed caution about revenue growth due to a rapid shift by users to mobile devices. In this amendment the Company mentioned, vaguely, that recent trends in which users were growing faster than revenue had continued into the second quarter:

> *The following supplements the discussion on page 14 of the Preliminary Prospectus under the caption "Risk Factors – Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results."*
>
> We believe this increased usage of Facebook on mobile devices has contributed to the recent trend of our daily active users (DAUs) increasing more rapidly than the increase in the number of ads delivered.
>
> *The following supplements the discussion on page 17 of the Preliminary Prospectus under the caption "Risk Factors – Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results."*
>
> As an example, we believe that the recent trend of our DAUs increasing more rapidly than the increase in the number of ads delivered has been due in part to certain pages having fewer ads per page as a result of these kinds of product decisions.
>
> *The following supplements the discussion on page 57 of the Preliminary Prospectus under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations – Results of Operations – Three Months Ended March 31, 2011 and 2012."*
>
> Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions. For additional information on factors that may affect these matters, see "Risk Factors – Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results" and "Risk Factors – Our culture emphasizes rapid innovation and prioritizes user engagement over short-

term financial results."

72.   The information in this amendment did not fully reveal the extent of the effect of mobile usage on Facebook's revenue and therefore did not fully cure the earlier misstatements in the original Registration Statement.[1]

73.   As would later be revealed, the Underwriter Defendants were privy at this time to information which caused certain of their analysts to reduce revenue forecasts for the Company.

74.   According to news reports, this lower revenue projection was selectively released by Underwriter Defendants to only certain clients.

75.   For example, according to a Tuesday May 22, 2012 Reuters report, *Morgan*

---

[1] As stated in the Company's Registration Statement filed with the SEC in a Form S-1 on February 1, 2012 (the "Registration Statement"), Facebook's revenue derives from largely from advertising:

> The substantial majority of our revenue is currently generated from third parties advertising on Facebook. In 2009, 2010, and 2011 and the first quarter of 2011 and 2012, advertising accounted for 98%, 95%, 85%, 87%, and 82%, respectively, of our revenue.
>
> * * *
>
> Our financial results in any given quarter can be influenced by numerous factors, many of which we are unable to predict or are outside of our control, including:
> - our ability to maintain and grow our user base and user engagement;
> - our ability to attract and retain advertisers in a particular period;
> - seasonal fluctuations in spending by our advertisers;
> - **the number of ads shown to users;**
> - the pricing of our ads and other products;
> - our ability to increase payments and other fees revenue;   the diversification and growth of revenue sources beyond current advertising and Payments; ...
>
> [Emphasis added.]

*Stanley cut Facebook estimates just before IPO*, following the Registration Statement amendment, Morgan Stanley, the lead underwriter on the deal, announced to major clients that the bank's consumer internet analyst, Scott Devitt ("Devitt"), was reducing his revenue forecasts for the company. Devitt cut his revenue estimate for the current second quarter significantly, and also cut his full-year 2012 revenue forecast.

76.     Significantly, the lower revenue projection came shortly before the IPO was priced at $38 a share, the high end of an already upwardly revised projected range of $34-$38, and before Facebook increased the number of shares being sold by 25 percent.

77.     JPMorgan Chase and Goldman Sachs, which were co-bookrunners on the IPO, also revised their estimates in response to Facebook's May 9 amendment to the Registration Statement, according to sources familiar with the situation.

78.     According to the Wall Street Journal Wednesday May 23, 2012 article *Inside Fumbled Facebook Offering*, news indicated that Goldman Sachs had also told clients earlier in May 2012 that they were reducing their earnings estimates for Facebook.

79.     By selectively disseminating information to certain of their clients, the Underwriter Defendants allowed some investors to act on the insider information.

80.     For example, the May 22, 2012 Reuters report indicated that at least one large hedge fund client knew that Facebook had "lowered their numbers around mid-roadshow" and the "client still bought the issue but 'flipped his IPO allocation and went short on the first day.'"

81.     This insider information contributed to the weak market for the IPO shares.

82.     On Monday, May 21, 2012, shares plummeted to end 10 percent below the IPO price.

83.     In reaction to further revelations of impropriety on Tuesday, May 22, 2012, shares

of Facebook's stock fell an 8.9 percent, to close at $31.00 per share.

84.     Also on Tuesday, May 22, 2012, it was revealed that Massachusetts Secretary of Commonwealth, William Galvin, issued a subpoena to Morgan Stanley over an analyst's discussions with investors on Facebook.

**Defendants' Materially False and Misleading**
**Statements In The Registration Statement and In Subsequent Amendments**

85.     Facebook partially addressed the effect of increased usage of mobile access in Company's Registration Statement and in subsequent amendments as follows:

> We have historically not shown ads to users accessing Facebook through mobile apps or our mobile website. **To the extent that increasing usage of Facebook through mobile apps or our mobile website substitutes for the use of Facebook through personal computers where we do show ads, the number of ads that we deliver to users and our revenue may be negatively affected unless and until we are successful with monetization strategies for mobile usage of Facebook, such as the implementation of sponsored stories in users' mobile News Feeds, which we began in March 2012.** We believe that people around the world will continue to increase their mobile usage of Facebook, and that some of this mobile usage has been and will continue to be a substitute for use of Facebook through personal computers.

> [Emphasis added.]

86.     This statement is materially false and misleading because the Company states that Facebook's revenue and the number of ads delivered to users *may* be negatively affected by increasing usage of mobile apps to access Facebook when in fact Facebook was aware that its revenue was being significantly impacted by these issues.

87.     Also in the Registration Statement, Facebook stated:

> Revenue in the first quarter of 2012 increased $327 million, or 45%, compared to the same period in 2011. **The increase was due primarily to a 37% increase in advertising revenue to $872 million. Advertising revenue grew due to a 35% increase in the number of ads delivered. The increase in ads delivered was driven primarily by user growth; MAUs grew 33% from March 31, 2011 to March 31, 2012 and average DAUs grew 41% from March 2011 to March 2012.** Average price per ad

24.

for the first quarter of 2012 compared to the first quarter of 2011 was unchanged, as an increase in the average price per ad in the United States and Canada was offset by an increased percentage of our worldwide ads being delivered in the Asia and Rest of World geographies where the average price per ad, while growing on a year-over-year basis, is relatively lower. The average price per ad was also affected by a decline in the average price per ad in Europe in the first quarter of 2012 compared to the same period in 2011 due, we believe, to continuing weak economic conditions in that region.

Payments and other fees revenue in the first quarter of 2012 increased to $186 million, or 98%, compared to the first quarter of 2011. Facebook Payments became mandatory for all game developers accepting payments on the Facebook Platform with limited exceptions on July 1, 2011. Accordingly, comparisons of Payments and other fees revenue to periods before this date may not be meaningful.

Based upon our experience in the second quarter of 2012 to date, the trend we saw in the first quarter of DAUs increasing more rapidly than the increase in number of ads delivered has continued. We believe this trend is driven in part by increased usage of Facebook on mobile devices where we have only recently begun showing an immaterial number of sponsored stories in News Feed, and in part due to certain pages having fewer ads per page as a result of product decisions. For additional information on factors that may affect these matters, see "Risk Factors—Growth in use of Facebook through our mobile products, where our ability to monetize is unproven, as a substitute for use on personal computers may negatively affect our revenue and financial results" and "Risk Factors—Our culture emphasizes rapid innovation and prioritizes user engagement over short-term financial results."

[Emphasis added.]

88.     This statement is materially false and misleading in that it equates growth in MAUs and DAUs with the increased growth in revenue without fully explaining the negative impact of the increase of Mobile MAUs on number of ads delivered compared to the increase in DAUs and on the lowered revenue projections that were presented to the analysts. Facebook was already aware that its revenue was being impacted by these issues at the time that it made this statement.

89.     Facebook also partially addressed the effect of increased usage of mobile access

25.

in Company's amended Registration Statement as follows:

> 2011 Compared to 2010. Revenue in 2011 increased $1,737 million, or 88% compared to 2010. The increase was due primarily to a 69% increase in advertising revenue to $3,154 million. Advertising revenue grew due to a 42% increase in the number of ads delivered and an 18% increase in the average price per ad delivered. The increase in ads delivered was driven primarily by user growth; MAUs grew 39% from December 31, 2010 to December 31, 2011 and average DAUs grew 48% from December 2010 to December 2011. The number of ads delivered was also affected by many other factors including product changes that significantly increased the number of ads on many Facebook pages beginning in the fourth quarter of 2010, **partially offset by an increase in usage of our mobile products,** where we did not show ads, and by various product changes implemented in 2011 that in aggregate modestly reduced the number of ads on certain pages. The increase in average price per ad delivered was affected by factors including improvements in our ability to deliver more relevant ads to users and product changes that contributed to higher user interaction with the ads by increasing their relative prominence.

[Emphasis added.]

90.    Again, this statement is materially false and misleading  in that it equates the growth in MAUs and DAUs with the increased growth in revenue without explaining the extent of the negative impact of the increase of Mobile MAUs on number of ads delivered compared to the increase in DAUs.  Facebook mentions a partial offset in the increase in number of ads due to increase usage of mobile ads but in doing so, underplays the full effect of mobile usage on the revenue.   Facebook was already aware that its revenue was being significantly impacted by these issues at the time that it made this statement.

91.    Moreover, the Offering Materials failed to disclose that the Underwriter Defendants reduced their revenue forecasts and selectively disclosed these revised forecasts to certain clients.

92.    As a result of these material misstatements and omissions, Facebook's common stock was offered at an artificially inflated price.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Facebook's common stock pursuant and/or traceable to the Offering who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

94.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Facebook shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Facebook and/or its transfer agent and from the Underwriter Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are:

      a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

      b. Whether the Registration Statement issued by Facebook contained untrue statements of material facts or omitted to state material information;

      c. Whether the Offering Materials issued by Facebook contained untrue statements of material facts or omitted to state material information; and

      d. To what extent the members of the Class have sustained damages and the proper measure of damages.

98.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

99.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

100.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with

respect to the Class as a whole.

**FIRST CLAIM**
**Violation of Section 11 of the Securities Act**
**Against Facebook, the Individual Defendants, and the Underwriter Defendants**

101.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

102.    This Claim is asserted against Facebook, the Individual Defendants, and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class as defined in Paragraph 93. Liability under this Count is predicated on these Defendants' respective participation in the Offering, which was conducted pursuant to the Registration Statement.

103.    As set forth above, the Registration Statement, when it became effective, contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.

104.    This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count. For purposes of asserting this claim under the Securities Act, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

105.    Facebook is the registrant for the IPO. Facebook issued, caused to be issued and participated in the issuance of materially false and misleading written statements and/or omissions of material facts to the investing public that were contained in the Registration Statement. As issuer of the shares, Facebook is strictly liable to Plaintiff and the Class for the misstatements and omissions.

106.    Each of the Individual Defendants, either personally or through an attorney-in-

29.

fact, signed the Registration Statement or was a director or person performing similar functions for the Issuer at the time of the IPO.

107.    Each of the Underwriter Defendants is liable as an underwriter in connection with the IPO.

108.    By reason of the foregoing, the Defendants named in this Count are liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class as defined herein.

109.    This Claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement, or after such discovery should have been made by exercise of reasonable diligence, and within three years after the Issuer's common stock was bona fide offered to the public.

## SECOND CLAIM
### Violation of Section 12 of the Securities Act
### Against Facebook and the Underwriter Defendants

110.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

111.    This Count is asserted against Facebook and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class as defined herein. Facebook and the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the securities issued in the Offering pursuant to the Offering Materials.

112.    These Offering Materials, including prospectuses, prospectus supplements and pricing supplements incorporated therein, contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose

material facts, as set forth in the charts provided herein.

113.    By reason of the foregoing, Facebook and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class as defined herein.

**THIRD CLAIM**
**Violation of Section 15 of the Securities Act**
**<u>Against the Individual Defendants</u>**

114.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

115.    This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other members of the Class as defined herein.

116.    At times relevant hereto, the Individual Defendants were controlling persons of Facebook within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants served as an executive officer of Facebook prior to and at the time of the Offering.

117.    The Individual Defendants at times relevant hereto participated in the operation and management of Facebook, and conducted and participated, directly and indirectly, in the conduct of Facebook's business affairs. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Facebook's financial condition and results of operations.

118.    Because of their positions of control and authority as officers of Facebook, the Individual Defendants were able to, and did, control the contents of the Registration Statement, which contained materially untrue financial information.

119.    By reason of the foregoing, the Individual Defendants are liable under Section 15

31.

of the Securities Act, to the same extent that Facebook is liable under Sections 11, 12(a)(2) of the Securities Act, to Plaintiff and the other members of the Class as defined herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Awarding rescission or a recessionary measure of damages; and

(e) Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all claims asserted herein.

DATED: May 23, 2012

                                **Morgan & Morgan, P.C.**
                                **Peter Safirstein (PS-6176)**

                                By:        
                                                  Peter Safirstein

                                Domenico G. Minerva
                                Elizabeth S. Metcalf
                                Five Pennsylvania Plaza
                                Suite 2315
                                New York, NY 10001
                                Telephone: (212) 564-1637
                                Facsimile: (212) 564-1807

Email: psafirstein@forthepeople.com
Email: dminerva@forthepeople.com
Email: emetcalf@forthepeople.com


Christopher S. Polaszek
**Morgan & Morgan, P.A.**
One Tampa City Center
201 N. Franklin St., 7th Fl.
Tampa, FL 33602
Telephone: (813) 314-6484
Facsimile: (813) 222-2406
Email: cpolaszek@forthepeople.com


Attorneys For Plaintiff

33.

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Maren Twining ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Date | Purchase/Sale | Quantity | Price per share |
|---|---|---|---|
| 5-18-12 | Purchase 5-18-12 | 50 | 38.00 |
| | | | |
| | | | |

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of the Certification except as detailed below:

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed this 22nd day of  May , 2012

_Maren Twining_
Maren Twining